IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JESSE LUGARO,

    Petitioner,

v.                           Civil Action No. 3:18CV779

HAROLD W. CLARKE,

    Respondent.

**MEMORANDUM OPINION**

Jesse Lugaro, a Virginia inmate proceeding pro se, brings this petition pursuant to 28 U.S.C. § 2254 petition (hereinafter "§ 2254 Petition," ECF No. 1) challenging his 2014 convictions in the Circuit Court of the City of Virginia Beach, Virginia (hereinafter "Circuit Court") of three counts of robbery of a residence and three counts of use of a firearm in the commission of a felony. Lugaro argues that he is entitled to relief on the following grounds:[1]

> Claim One:    "[Lugaro] was deprived of the 6th Amendment's right to the effective representation of counsel when court-appointed counsel neglected to perform any pre-trial investigations, which resulted in [counsel's] failure to identify, develop, or utilize available exculpatory materials." (Mem. Supp. § 2254 Pet. 3, ECF No. 2.)

---

[1] The Court corrects the capitalization, spelling, and punctuation in quotations from Lugaro's submissions. The Court employs the pagination assigned by the CM/ECF docketing system to the parties' submissions.

| Claim Two: | "[Lugaro] suffered a contravention of the 6th Amendment's right to the effective representation of counsel when court-appointed counsel's deficient pre-trial investigation resulted in [counsel's] failure to impeach the credibility of witness testimony, inherently depriving [Lugaro] the right to confrontation through cross-examination." (Id.) |
|---|---|
| Claim Three: | "[Lugaro] incurred a deprivation of the 6th Amendment's right to effective representation of counsel when court-appointed counsel's perfunctory pre-trial preparation resulted in a breakdown in the adversarial testing process and ultimately denied [Lugaro] a fair trial." (Id.) |
| Claim Four: | "[Lugaro's] 5th and 14th Amendment right[s] to the due process and equal protection of the laws were violated when [he] was arbitrarily found guilty for crimes without the essential elements comprising those offenses being proven beyond a reasonable doubt." (Id.) |

Respondent has filed a Motion to Dismiss, arguing that Lugaro's claims lack merit. (ECF No. 9.) Lugaro has responded. (ECF No. 14.) For the reasons set forth below, the Motion to Dismiss (ECF No. 9) will be granted.

## I. FACTUAL AND PROCEDURAL HISTORY

After a bench trial, Lugaro was convicted of three counts of robbery of a residence and three counts of use of a firearm in the commission of a felony. (Mar. 19, 2014 Tr. 9); Commonwealth v. Lugaro, No. CR13-2817, at 1-2 (Va. Cir. Ct. Sept. 12, 2014). The Circuit Court sentenced Lugaro to an active sentence of

twenty-seven years of incarceration. Commonwealth v. Lugaro, No. CR13-2817, at 2 (Va. Cir. Ct. Sept. 12, 2014).

Lugaro, proceeding with counsel, appealed; however, Lugaro's appeal was denied because "[t]he record on appeal [did] not contain a transcript or written statement of facts for the March 19, 2014 trial." Lugaro v. Commonwealth, No. 1736-14-1 (Va. Ct. App. Apr. 15, 2015.) Thereafter, Lugaro moved for leave to pursue a delayed appeal in the Court of Appeals of Virginia. Motion for Delayed Appeal 1, Lugaro v. Commonwealth, No. 1759-15-1 (Va. Ct. App. filed Sept. 18, 2015). On October 22, 2015, the Court of Appeals of Virginia granted Lugaro's motion, and authorized him to file a replacement notice of appeal. Lugaro v. Commonwealth, No. 1759-15-1, at 1 (Va. Ct. App. Oct. 22, 2015).

In his replacement notice of appeal, Lugaro, proceeding with counsel, raised the following assignment of error: "The trial court erred in finding sufficient evidence of robbery and use of a firearm where appellant did not aid in the criminal conduct or share in the criminal intent of principal." Petition for Appeal 2, Lugaro v. Commonwealth, No. 1759-15-1 (Va. Ct. App. filed Mar. 7, 2016). On May 18, 2016, the Court of Appeals of Virginia denied the petition for appeal. Lugaro v. Commonwealth, No. 1759-15-1, at 1 (Va. Ct. App. May 18, 2016). A three-judge panel also denied the petition for appeal. Lugaro v. Commonwealth, No. 1759-15-1, at 1 (Va. Ct. App. July 26, 2016). On April 11, 2017, the Supreme

3

Court of Virginia refused the petition for appeal. Lugaro v. Commonwealth, No. 161236, at 1 (Va. Apr. 11, 2017).

On March 12, 2018, Lugaro filed a petition for a writ of habeas corpus in the Supreme Court of Virginia. Petition for Writ of Habeas Corpus 1, Lugaro v. Commonwealth, No. 180352 (Va. filed Mar. 12, 2018). In that petition, Lugaro raised the same claims that he raises in the instant § 2254 Petition. See generally id. On August 29, 2018, the Supreme Court of Virginia dismissed the petition. Lugaro v. Commonwealth, No. 180352, at 8 (Va. Aug. 28, 2018). Thereafter, Lugaro filed the instant § 2254 Petition. (§ 2254 Pet. 14.)

## II. APPLICABLE CONSTRAINTS UPON HABEAS REVIEW

In order to obtain federal habeas relief, at a minimum, a petitioner must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996 further circumscribed this Court's authority to grant relief by way of a writ of habeas corpus. Specifically, "[s]tate court factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence." Gray v. Branker, 529 F.3d 220, 228 (4th Cir. 2008) (citing 28 U.S.C. § 2254(e)(1)). Additionally, under 28 U.S.C. § 2254(d), a federal court may not grant a writ of habeas corpus

4

based on any claim that was adjudicated on the merits in state court unless the adjudicated claim:

> **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> **(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has emphasized that the question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citing Williams v. Taylor, 529 U.S. 362, 410 (2000)).

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

### A. Applicable Law

To demonstrate ineffective assistance of counsel, a convicted defendant must show first that counsel's representation was deficient and, second, that the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of Strickland, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" Burch v. Corcoran, 273 F.3d 577, 588 (4th Cir. 2001) (quoting Strickland, 466 U.S. at 689).

5

The prejudice component requires a defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. Id. at 697.

Respondent acknowledges that Lugaro raised his four claims in his state habeas petition before the Supreme Court of Virginia. (Br. Supp. Mot. Dismiss 2, ECF No. 11.) As discussed in detail below, the Court has reviewed the entirety of Lugaro's § 2254 Petition and attachments, and the state court record, and concludes that the Supreme Court of Virginia's determination that Lugaro's claims lack merit is not unreasonable.

**B. Claims One, Two, and Three**

In Claims One, Two, and Three, Lugaro presents claims of ineffective assistance based on his assertion that counsel failed to conduct an adequate pre-trial investigation. Specifically, in Claim One, Lugaro argues that counsel rendered ineffective assistance "when court-appointed counsel neglected to perform any pre-trial investigations, which resulted in [counsel's] failure to identify, develop, or utilize available exculpatory materials." (Mem. Supp. § 2254 Pet. 2.) Relatedly, in Claim Two, Lugaro argues

that "court-appointed counsel's deficient pre-trial investigation resulted in [counsel's] failure to impeach the credibility of witness testimony, inherently depriving [Lugaro] the right to confrontation through cross-examination" (id.), and in Claim Three, Lugaro argues that counsel rendered ineffective assistance "when court-appointed counsel's perfunctory pre-trial preparation resulted in a breakdown in the adversarial testing process and ultimately denied [Lugaro] a fair trial." (Id.)

The Supreme Court of Virginia appropriately addressed these claims together. In explaining and rejecting Claims One, Two, and Three here, the Supreme Court of Virginia found:

> In portions of claims (1), (2), and (3), petitioner contends he was denied the effective assistance of counsel because trial counsel failed to investigate or interview Shannon Brown and, as a result, he was unable to effectively cross examine Brown or to impeach her credibility. Petitioner contends Brown's testimony and her two statements to the police were inconsistent with each other. In addition, petitioner alleges Brown never claimed the firearm used in the robberies belonged to petitioner, and appears to allege this information was exculpatory.
>
> The Court holds these portions of claims (1), (2), and (3) satisfy neither the "performance" nor the "prejudice" prong of the two-part test enunciated in Strickland v. Washington, 466 U.S. 668, 687 (1984). The record, including the trial transcript and petitioner's exhibits, including Brown's attorney's notes of his interview with Brown, demonstrates on November 16, 2012, Steven Skeems and Ryan Thomas were with Joel Powell and Donald Soutiere at 5576 Aurora Drive, a residence Powell and Soutiere shared with Paul Benner, who was not home. A week prior, Benner and his girlfriend had gotten into a fight with Shannon Brown and Destynee White at 5576 Aurora Drive. As a result of the fight, White broke her finger and Brown suffered a concussion. Brown and White

were cousins and friends with Christopher Averette who introduced them to petitioner. On November 16, 2012, Brown and White were "hanging out" with Averette and petitioner at Averette's house. They were drinking and at least Brown, White, and Averette were using marijuana. Later, they "drove around" and happened to be near 5576 Aurora Drive. Averette and petitioner decided they wanted to scare the people who lived at Benner's house in retaliation for the fight in which White and Brown were injured. They drove to 5576 Aurora Drive and White and Brown knocked on the door. Brown testified she and White went to the door first because she knew "they would let [her] in." Once inside, Brown apologized to Powell for the incident, while White sent a text message to Averette and petitioner letting them know how many people were inside.

Averette and petitioner knocked on the door a few minutes later and entered the house after Soutiere opened the door. Everyone was standing in the kitchen when Averette and petitioner asked about the incident the week before causing Powell, Thomas, Skeems, and Soutiere to laugh. Brown testified Averette and petitioner "started getting violent," and "took the gun out." At that point, Brown and White left the house, went to the car, and "were getting ready to leave [Averette and petitioner]." While Brown and White sat in the car, Averette and petitioner robbed Powell, Thomas, and Skeems. After the robbery, Averette and petitioner returned to the car and White drove away. Brown testified she saw Averette and petitioner wiping off cell phones and wallets and throwing the cell phones out of the car. She heard them talking about the gun belonging to petitioner, and complaining about the money they obtained. She further testified she "knew about the gun," because petitioner, "when he joined [Brown] and [White] and [Averette's] little group, he brought the gun with him and [they] didn't have any guns before then."

Brown testified they went to Averette's house where Averette and petitioner "scared [Brown and White] into turning [themselves] in" and telling police they met two men at a bar and took them to 5576 Aurora Drive where the two men robbed everyone. Brown testified she told police this story when they first interviewed her. Two months before the trial, police interviewed Brown again. This time Brown told then she, White, Averette, and petitioner had been together drinking and using drugs on

the day of the incident. Brown told them she and White took Averette and petitioner to 5576 Aurora Drive but left and waited in the car because "she knew something bad was going to happen." Brown testified she was initially charged with multiple felonies in relation to her participation in the robberies but entered a plea agreement pursuant to which she pled guilty to accessory after the fact to robbery, a misdemeanor. One of the conditions of her plea agreement was that she "cooperate and testify truthfully in these matters."

On cross-examination, Brown acknowledged she initially faced "around 900 years" of incarceration but, after accepting the plea agreement and pleading guilty to the accessory charge, she was placed on probation and received no active jail time. Brown conceded that only after she accepted the plea agreement did she tell police Averette and petitioner robbed the men at 5576 Aurora Drive.

Thus, counsel cross-examined Brown on her inconsistent statements and on the fact she was testifying against petitioner as part of a favorable plea agreement. Petitioner fails to proffer additional questions counsel could have asked Brown or to show how such questions would have impeached her credibility or otherwise undermined her testimony. In addition, contrary to petitioner's claims, Brown testified the gun used in the robberies belonged to petitioner. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

In additional portions of claims (1), (2), and (3), petitioner contends he was denied the effective assistance of counsel because trial counsel failed to investigate or interview Soutiere and, as a result, he was unable to effectively cross examine Soutiere or impeach his credibility.

The Court holds these portions of claims (1), (2), and (3) satisfy neither the "performance" or the "prejudice" prong of the two-part test enunciated in Strickland. Petitioner fails to identify any information counsel might have gleaned by investigating or interviewing Soutiere, or to articulate how such information could have been used to more effectively cross-examine Soutiere. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for

9

counsel's alleged errors, the result of the proceeding would have been different.

In additional portions of claims (1), (2), and (3), petitioner contends he was denied the effective assistance of counsel because trial counsel failed to investigate or interview Skeems and, as a result, he was unable to effectively cross-examine Skeems or to impeach his credibility. Petitioner contends Skeems, who testified at trial that Averette told petitioner to "find some rope" to tie up the victims and that petitioner unsuccessfully searched the house for rope, was interviewed by detectives and never mentioned petitioner attempted to find rope.

The Court holds these portions of claims (1), (2), and (3) fail to satisfy the "prejudice" prong of the two-part test enunciated in Strickland. The record, including the trial transcript and notes of the police interview with Skeems, demonstrates Skeems testified Averette and petitioner arrived at 5576 Aurora Drive about five minutes after Brown and White. Averette "kind of barged in" while petitioner remained on the porch until Soutiere invited him inside. Averette went into the kitchen and asked Soutiere where Benner was and who Benner's best friends were. Then, Averette produced a gun and ordered Skeems, Soutiere, Powell, and Thomas to the floor. Skeems testified petitioner was in the kitchen standing next to Averette when Averette pulled out the gun. Averette told petitioner to stay with Soutiere, then went to the living room and robbed Powell, Thomas, and Skeems. Averette returned to the kitchen and told petitioner to find "some rope," and said, "We're going to shoot them." Thomas also testified Averette "asked for something to tie – – to tie us up," Powell testified Averette told petitioner to "grab some rope" before he ordered the victims to the ground, and Soutiere testified either Averette or petitioner said, "Get some telephone wire or something so we can tie them up" and that petitioner warned him to stay on the ground and to do as Averette said. Skeems testified petitioner "made a loop around the back half of the house" then came back and told Averette he couldn't find anything." Skeems testified that, when Averette was in the kitchen, Thomas and Powell fled through the back door, after which Skeems used a banister rail from the staircase to hit Averette, driving him into the kitchen. Petitioner approached Skeems, put his hands around his throat, and told him to

calm down. Skeems struck petitioner with the railing and petitioner "ran out the front door."

When interviewed by the police, Skeems did not mention the rope, but, consistent with his trial testimony, said Averette and petitioner arrived at the house a few minutes after Brown and White. Averette subsequently produced a gun and ordered Soutiere to the floor and that he took the railing from the stairs and struck Averette with it. Skeems also told the police petitioner approached Skeems after he struck Averette with the rail and told him, "chill out, it will be okay," at which point, Skeems struck petitioner.

In light of the testimony by Thomas, Soutiere, and Powell that petitioner and Averette contemplated tying up the victims and the other evidence of petitioner's active involvement in the robberies, including his providing the gun used by Averette, his warning to Soutiere, and his sharing the proceeds with Averette, petitioner cannot show counsel's failure to attempt to impeach Skeems regarding his failure to mention the rope to the police negatively impacted the outcome of his case. Thus, petitioner has failed to demonstrate there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

In additional portions of claims (1), (2), and (3), petitioner contends he was denied the effective assistance of counsel because trial counsel failed to investigate or interview Powell and, as a result, he was unable to effectively cross-examine Powell or to impeach his credibility. Petitioner contends Powell, who testified at trial that Averette told petitioner to "find some rope" to tie up the victims, was interviewed by detectives and never mentioned Averette told petitioner to find some rope.

The Court holds these portions of claims (1), (2), and (3) fail to satisfy the "prejudice" prong of the two-part test enunciated in Strickland. The record, including the trial transcript and the notes of the police interview with Powell demonstrates Powell testified that, after Soutiere opened the door for Averette and petitioner, Averette went in the kitchen with Soutiere. Averette and petitioner spoke to Soutiere about the incident at the house the week prior involving Brown and White. Averette then "became enraged," produced a gun, told petitioner "grab some rope," and ordered Soutiere to the ground. Thomas and

Skeems also testified Averette asked petitioner to get something to tie the victims up with and Soutiere testified either Averette or petitioner said, "Get some telephone wire or something so we can tie them up" and that petitioner warned them to stay on the ground and to do as Averette said. Powell testified that after he told petitioner to get some rope, Averette came to the living room "pointing the gun at [Powell] and [Thomas] and [Skeems]." Averette robbed Skeems, Powell, and Thomas of their cell phones then returned to the kitchen. At that point, Powell and Thomas ran out of the house.

When interviewed by police, Powell said Averette arrived at the house with petitioner ten minutes after Brown and White. Averette told Powell his name was Jay, he demanded to see Brenner [sic], started yelling, produced a gun, and robbed everyone. Powell said nothing more about petitioner but gave police a description of him.

In light of the testimony by Thomas, Soutiere, and Powell that petitioner and Averette contemplated tying up the victims and the other evidence of petitioner's active involvement in the robberies, including his providing the gun used by Averette, his warning to Soutiere, and his sharing the proceeds with Averette, petitioner cannot show counsel's failure to attempt to impeach Powell regarding his failure to mention the rope to the police negatively impacted the outcome of his case. Thus, petitioner has failed to demonstrate there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

In additional portions of claims (1), (2), and (3), petitioner contends he was denied the effective assistance of counsel because trial counsel failed to investigate, interview, and subpoena White, who was interviewed by police and never alleged that the firearm Averette used belonged to petitioner, and who would have testified Averette "was solely responsible for this incident."

The Court holds these portions of claims (1), (2), and (3) satisfy neither the "performance" nor the "prejudice" prong of the two-part test enunciated in Strickland. The record, including petitioner's exhibits, demonstrates White also faced charges for her participation in the robberies and agreed to cooperate with the police after the police disclosed to her attorney that she had made incriminating calls from the

jail that had been recorded. Petitioner has not provided
an affidavit from White stating she would have been
willing to testify at petitioner's trial and the
substance of her expected testimony, nor has he
proffered any reason to believe White would have been
willing to testify on his behalf. Further, petitioner
has failed to proffer the basis for White's alleged
knowledge or belief that the firearm did not belong to
petitioner or to otherwise show such testimony by White
would have been admissible. See Rule 2:802 ("Hearsay is
not admissible except as provided by these Rules, other
Rules of the Supreme Court of Virginia, or by Virginia
statues or case law."). Thus, petitioner has failed to
demonstrate that counsel's performance was deficient or
that there is a reasonable probability that, but for
counsel's alleged errors, the result of the proceeding
would have been different.

In additional portions of claims (1), (2), and (3),
petitioner contends he was denied the effective
assistance of counsel because trial counsel failed to
identify and interview a third woman who petitioner
alleges was present and whose testimony "would have been
potentially exonerating."

The Court holds these portions of claims (1), (2),
and (3) satisfy neither the "performance" nor the
"prejudice" prong of the two-part test enunciated in
Strickland. The record, including the trial transcript,
demonstrates Thomas and Soutiere testified "a third
girl" came inside with Brown and White, although neither
Brown, Skeems, nor Powell mentioned a third girl.
Petitioner has not identified the woman or provided an
affidavit from the woman stating she would have been
willing to testify at petitioner's trial and the
substance of her expected testimony. Further,
petitioner does not allege he provided counsel with
sufficient identifying information that counsel would
have been able to identify and subpoena the woman. Thus,
petitioner has failed to demonstrate that counsel's
performance was deficient or that there is a reasonable
probability that, but for counsel's alleged errors, the
result of the proceeding would have been different.

In additional portions of claims (1), (2), and (3),
petitioner contends he was denied the effective
assistance of counsel because trial counsel refused to
make an opening statement, call his witnesses, proffer
any evidence, or move to strike the Commonwealth's
evidence.

The Court holds these portions of claims (1), (2), and (3) satisfy neither the "performance" nor the "prejudice" prong of the two-part test enunciated in Strickland. Petitioner fails to articulate the substance of the opening statement he contends counsel should have made or to explain how making such a statement could have positively impacted the outcome of his trial, fails to identify the witnesses he contends counsel should have called or to articulate the substance of their expected testimony, and fails to proffer the evidence he contends counsel should have introduced. In addition, counsel could reasonably have determined the Commonwealth's evidence, including the testimony that petitioner warned Soutiere to stay on the ground and obey Averette, searched for something with which to bind the victims, attempted to restrain Skeems, provided the firearm used in the robberies, and shared in the proceeds with Averette, if credited by the trial court, was sufficient to prove petitioner's guilt. Counsel was not ineffective for failing to make a meritless motion to strike. See Correll v. Commonwealth, 232 Va. 454, 470, 352 S.E.2d 352, 361 (1987) (counsel not ineffective for failing to make meritless objection). Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

In additional portions of claims (1), (2), and (3), petitioner contends the "cumulative effect of [counsel's] numerous negative trial errors effectively deprived [petitioner] of a fair trial."

The Court holds these portions of claims (1), (2), and (3) are without merit. As addressed previously, petitioner's individual claims of ineffective assistance of counsel are without merit. "Having rejected each of petitioner's individual claims, there is no support for the proposition that such actions when considered collectively have deprived petitioner of his constitutional right to effective assistance of counsel." Lenz v. Warden of the Sussex I State Prison, 267 Va. 218, 340, 593 S.E.2d 292, 305, cert. denied, 542 U.S. 953 (2004).

Lugaro v. Commonwealth, No. 180352, at 1-8 (Va. Aug. 29, 2018)

(alteration in original). The Court discerns no unreasonable

application of the law and no unreasonable determination of the facts, and Lugaro fails to direct the Court to any law or evidence that demonstrates that the Supreme Court of Virginia's conclusion is incorrect, much less unreasonable. See 28 U.S.C. § 2254(d)(1)‒(2).

Moreover, Lugaro offers nothing more than vague, unsupported assertions that had counsel performed an adequate pre-trial investigation, such investigation would have resulted in the identification of "available exculpatory materials," and allowed counsel to impeach witnesses and to engage "in the adversarial testing process" at Lugaro's trial. (Mem. Supp. § 2254 Pet. 2); see Sanders v. United States, 373 U.S. 1, 19 (1963) (finding denial of habeas relief appropriate where petitioner "stated only bald legal conclusions with no supporting factual allegations"); Bassette v. Thompson, 915 F.2d 932, 940–41 (4th Cir. 1990) (explaining that petitioner's failure to allege "what an adequate investigation would have revealed or what . . . witnesses might have said, if they had been called to testify" was fatal to his ineffective assistance of counsel claim).

Additionally, contrary to Lugaro's assertion that counsel's inadequate pre-trial investigation "resulted in [counsel's] inability to properly impeach [the witnesses] through effective cross-examination" (Mem. Supp. § 2254 Pet. 9), and "resulted in a breakdown in the adversarial testing process" (id. at 2), through

cross-examination, counsel elicited inconsistent and potentially impeaching testimony at Lugaro's trial. For example, on cross-examination, Brown admitted that she "[was] originally charged with felonies" and was facing "around 900 years" in prison, and that as a result of a plea agreement, the charges were "reduced to misdemeanors." (Mar. 19, 2014 Tr. 78-79.) Brown also admitted that her testimony at Lugaro's trial was inconsistent with her initial statements to the police, and that her statements regarding the incident had changed after she accepted the plea agreement. (Mar. 19, 2014 Tr. 79-80.) In counsel's closing argument, counsel argued that Brown's credibility was a central issue in the case. (Mar. 19, 2014 Tr. 86-88.) In light of counsel's efforts to elicit inconsistent and impeaching testimony at trial, Lugaro fails to demonstrate that he was prejudiced by counsel's allegedly inadequate pre-trial investigation.

Furthermore, to the extent that Lugaro faults counsel for failing to call White and the third woman he alleges was present on November 16, 2014, who he now identifies as "Laura," Lugaro offers nothing more than vague, unsupported conclusions that the testimony of White and the third woman would have bolstered his defense. (Mem. Supp. § 2254 Pet. 9, 11); see United States v. Terry, 366 F.3d 312, 316 (4th Cir. 2004) (observing that where a petitioner faults counsel for not calling a witness, the petitioner should provide "concrete evidence of what [the witness] would have

16

testified to in exculpation"); <u>Bassette</u>, 915 F.2d at 940-41 (requiring proffer of mitigating evidence to state claim of ineffective assistance); <u>see also</u> <u>Sanders</u>, 373 U.S. at 19 (finding denial of habeas relief appropriate where petitioner "stated only bald legal conclusions with no supporting factual allegations").

Accordingly, because Lugaro has failed to demonstrate any deficiency of counsel or resulting prejudice with respect to counsel's pre-trial investigation, Claims One, Two, and Three will be dismissed.

### IV. SUFFICIENCY OF THE EVIDENCE

In Claim Four, Lugaro contends that the evidence was insufficient to convict him of three counts of robbery of a residence and three counts of use of a firearm in the commission of a felony, and that "[he] was arbitrarily found guilty for crimes without the essential elements comprising the offenses being proven beyond a reasonable doubt." (Mem. Supp. § 2254 Pet. 2.) Lugaro argues that "the Commonwealth posited that [he] was a principal in the 2nd degree, yet [he] never assisted, encouraged, or incited Averette during the commission of this incident," and he "didn't take or demand anything from anyone and [he] didn't know this [robbery] was going to occur." (<u>Id.</u> at 15.)

A federal habeas petition warrants relief on a challenge to the sufficiency of the evidence only if "no rational trier of fact

17

could find [proof of] guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 317 (1979). The relevant question in conducting such a review is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (citing Johnson v. Louisiana, 406 U.S. 356, 362 (1972)). The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Id. at 318.

On appeal, Lugaro challenged the sufficiency of the evidence, arguing that "the evidence [was] insufficient to support his convictions because he 'did not aid in the criminal conduct or share in the criminal intent of [the] principal." Lugaro v. Commonwealth, No. 1759-15-1, at 1 (Va. Ct. App. May 18, 2016) (second alteration in original). In rejecting Lugaro's sufficiency of the evidence argument, the Court of Appeals of Virginia aptly found:

> "When considering on appeal the sufficiency of the evidence presented below, we 'presume the judgment of the trial court to be correct' and reverse only if the trial court's decision is 'plainly wrong or without evidence to support it.'" Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (en banc) (quoting Davis v. Commonwealth, 39 Va. App. 96, 99, 570 S.E.2d 875, 876-77 (2002)). "On appeal, we will consider the evidence in the light most favorable to the Commonwealth, as it prevailed in the trial court."

<u>Whitehurst v. Commonwealth</u>, 63 Va. App. 132, 133, 754 S.E.2d 910, 910 (2014).

So viewed, the evidence proved that on November 16, 2012, Steven Skeems, Joel Powell, Ryan Thomas, and Donald Soutiere were together at Powell's residence when Shannon Brown and another woman arrived at the house uninvited. A short time later, appellant and Christopher Averette entered the residence. They were unknown to the men in the house but were companions of the women who had just arrived. Averette threatened Soutiere with a gun in the kitchen and then instructed appellant to remain with Soutiere. Appellant stood over the kneeling Soutiere as Averette moved into the living room, ordered the other men to get to the ground, and threatened to shoot them if they did not comply. Averette struck both Powell and Skeems in the head with the gun and took cell phones, a wallet, and cash from the victims.

Averette returned to the kitchen and told appellant they were "going to shoot them." Appellant looked for rope to tie the victims. While Averette was in the kitchen, Powell and Thomas escaped out a back door. Skeems struck Averette with a banister rail, and appellant came to Averette's aid and restrained Skeems. Appellant put his hands around Skeems' throat and ordered him to "calm down." Skeems struck appellant in the head with the railing and then appellant and Averette fled the residence and left the area in a car driven by the women who earlier entered the house.

Brown testified she was with Averette and appellant that day and that appellant and Averette were looking for "mischief to get into." She explained they decided to scare the victims in retaliation for a previous conflict. She stated the gun used during the incident belonged to appellant and that Averette and appellant together planned the crimes and created a cover story to tell the police.

Appellant argues that "[n]o witness testified to any conduct by [a]ppellant which supports a reasonable inference that [a]ppellant was an aider, abettor, or shared in the criminal intent."

"Generally, in the case of every felony, a principal in the second degree may be indicted, tried, convicted, and punished in all respects as if a principal in the first degree." <u>Washington v. Commonwealth</u>, 43 Va. App. 291, 306, 597 S.E.2d 256, 2673 (2004)

(quoting Taylor v. Commonwealth, 260 Va. 683, 687–88, 537 S.E.2d 592, 594 (2000)).

> A principal in the first degree is the actual perpetrator of the crime. A principal in the second degree, or an aider and abettor as he is sometimes termed, is one who is present, actually or constructively, assisting the perpetrator in the commission of the crime. In order to make a person a principal in the second degree actual participation in the commission of the crime is not necessary. The test is whether or not he was encouraging, inciting, or in some manner offering aid in the commission of the crime. If he was present lending countenance, or otherwise aiding while another did the act, he is an aider and abettor or principal in the second degree.

Muhammad v. Commonwealth, 269 Va. 451, 482, 619 S.E.2d 16, 33 (2005) (quoting Jones v. Commonwealth, 208 Va. 370, 372–73, 157 S.E.2d 907, 909 (1967)).

Here, Brown testified appellant and Averette together planned the crimes and that appellant supplied the weapon Averette used during the incident. Victim testimony established appellant not only watched over Soutiere as Averette beat and took property from the other victims, but also participated in the violence against Skeems as Skeems attempted to escape from Averette. Appellant then fled the scene with Averette. Appellant's behavior during the entire incident provided the trial court with sufficient evidence to conclude appellant was directly involved in the crimes and shared Averette's criminal intent.

The trial court accepted Brown's testimony and rejected appellant's testimony that she was biased and unbelievable. "[D]etermining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact." Parham v. Commonwealth, 64 Va. App. 560, 565, 770 S.E.2d [204], 207 (2015). The record supports the trial court's credibility determination. The Commonwealth's evidence was competent, was not inherently incredible, and was sufficient to prove beyond a reasonable doubt that appellant was guilty of three counts each of robbery and use of a firearm during the commission of a felony.

<u>Lugaro v. Commonwealth</u>, No. 1759-15-1, at 1-3 (Va. Ct. App. May 18, 2016) (last alteration added).

Upon review of the Court of Appeals of Virginia's decision and the record in this case, the Court discerns no unreasonable application of the law and no unreasonable determination of the facts. <u>See</u> 28 U.S.C. § 2254(d)(1)-(2). Despite Lugaro's argument to the contrary, the evidence was sufficient for any rational factfinder to have found Lugaro guilty of robbery and use of a firearm in the commission of a felony. In Virginia, robbery "is not statutorily defined." <u>George v. Commonwealth</u>, 411 S.E.2d 12, 20 (Va. 1991). "Robbery at common law is defined as the taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation." <u>Id.</u> (quoting <u>Pierce v. Commonwealth</u>, 138 S.E.2d 28, 31 (1964)).

Furthermore, "[i]t is a well-settled rule that a defendant is guilty as a principal in the second degree if he is guilty of some overt act done knowingly in furtherance of the commission of the crime, or if he shared in the criminal intent of the principal committing the crime." <u>McMorris v. Commonwealth</u>, 666 S.E.2d 348, 351 (Va. 2008) (citations omitted). "All participants in such planned enterprises may be held accountable for incidental crimes committed by another participant during the enterprise even though not originally or specifically designed." <u>Berkeley v. Virginia</u>,

451 S.E.2d 41, 43 (Va. Ct. App. 1994) (citations omitted). That
is, "[g]enerally in Virginia, a principal in the second degree is
subject to the same punishment as the principal in the first
degree," who is the "actual perpetrator of the crime." Muhammad,
619 S.E.2d at 33 (citations omitted).

Moreover, with respect to the charge of use of a firearm in
the commission of a felony, the Supreme Court of Virginia has held
that "one who never held or possessed a firearm might nevertheless
be convicted as a principal in the second degree of the use of a
firearm in the commission of a felony where he acted in concert
with the gunman." Carter v. Commonwealth, 348 S.E.2d 265, 267
(Va. 1986) (citing Cortner v. Commonwealth, 281 S.E.2d 908 (Va.
1981)). In Virginia, "concert of action" is defined "as an 'action
that has been planned, arranged, adjusted, agreed on and settled
between the parties acting together pursuant to some design or
scheme.'" Berkeley, 451 S.E.2d at 43 (citations omitted) (some
internal quotation marks omitted).

As aptly summarized by the Court of Appeals of Virginia, the
evidence presented at trial was sufficient for any rational
factfinder to convict Lugaro of three counts of robbery of a
residence and three counts of use of a firearm in the commission
of a felony. Specifically, the testimony of the four individuals
at the residence, as well as the testimony of Brown, one of the
women who accompanied Lugaro and Averette when they went to the

22

residence, presents ample evidence that Lugaro was present and assisted in the robbery of the victims at the residence, that during the robbery a gun was used, and that the gun belonged to Lugaro. See also infra Part V.A (summarizing the evidence presented at Lugaro's trial). Therefore, upon review of the record in this case, the Court concludes that the Court of Appeals of Virginia's decision was not an unreasonable determination of the facts. See 28 U.S.C § 2254(d). For these reasons, Claim Four lacks merit and will be dismissed.

## V.    ACTUAL INNOCENCE

For the first time in his Response, Lugaro argues that he is innocent "as a principal in the 2nd degree." (Resp. 9.) Generously construing Lugaro's argument to be a claim of actual innocence, as discussed below, Lugaro is neither actually innocent nor does his conviction result in a fundamental miscarriage of justice.

As an initial matter, it is unclear whether habeas petitioners may raise freestanding actual innocence claims.[2] See McQuiggin v. Perkins, 569 U.S. 383, 392 (2013) (citation omitted) ("[The Supreme

---

[2] With respect to whether a habeas petitioner may raise a freestanding claim of actual innocence, "Fourth Circuit authority on this issue is inconclusive and conflicting." Hazel v. United States, 303 F. Supp. 2d 753, 760 (E.D. Va. 2004) (citing Royal v. Taylor, 188 F.2d 239, 243 (4th Cir. 1999); Hunt v. Dade, No. 98-6808, 2000 WL 219755, at *2 (4th Cir. Feb. 25, 2000)).

Court] [has] not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."). Nevertheless, "[c]laims of actual innocence, whether presented as freestanding ones, or merely as gateways to excuse a procedural default, should not be granted casually." Wilson v. Greene, 155 F.3d 396, 404 (4th Cir. 1998) (citations omitted). Further, the Supreme Court has "described the threshold for any hypothetical freestanding innocence claim as 'extraordinarily high.'" House v. Bell, 547 U.S. 518, 555 (2006) (quoting Herrera, 506 U.S. at 417 (finding that "whatever burden a hypothetical freestanding innocence claim would require," even a petitioner who "cast considerable doubt on his guilt—doubt sufficient to satisfy Schlup's[3] gateway standard for obtaining federal review despite a state procedural default," would likely not satisfy it).

Here, the Court reviews Lugaro's arguments under the more lenient standard for gateway actual innocence claims. Even under the more lenient standard for gateway actual innocence claims, Lugaro may obtain review of his claims "only if he falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'" Schlup, 513 U.S. at 314-15 (alteration in original) (quoting McCleskey v. Zant, 499 U.S. 467, 494 (1991)).

---

[3] Schlup v. Delo, 513 U.S. 298 (1995).

A gateway claim requires a petitioner to present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Id. at 324. "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Id.

If a petitioner meets the burden of producing new, truly reliable evidence of his or her innocence, the Court then considers "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial,'" and determines whether the petitioner has met the standard for a gateway claim of innocence. House, 547 U.S. at 538 (quoting Schlup, 513 U.S. at 327-28). The Court must determine "whether 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" Sharpe v. Bell, 593 F.3d 372, 377 (4th Cir. 2010) (quoting Schlup, 513 U.S. at 327-28). "The Court need not proceed to this second step of the inquiry unless the petitioner first supports his or her claim with evidence of the requisite quality." Hill v. Johnson, No. 3:09CV659, 2010 WL 5476755, at *5 (E.D. Va. Dec. 30, 2010) (citing Weeks v. Bowersox, 119 F.3d 1342, 1352-53 (8th Cir. 1997); Feaster v. Beshears, 56 F. Supp. 2d 600, 610 (D. Md. 1999)).

Moreover, "actual innocence" means factual innocence and not just legal insufficiency. See Calderon v. Thompson, 523 U.S. 538, 559 (1998) (alteration in original) (citations and internal quotation marks omitted) ("[T]he miscarriage of justice exception is concerned with actual as compared to legal innocence."). Furthermore, with respect to claims of actual innocence,

> The Supreme Court has instructed that, "when considering an actual-innocence claim in the context of a request for an evidentiary hearing, the District Court need not 'test the new evidence by a standard appropriate for deciding a motion for summary judgment,' but rather may 'consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.'"

Carter v. Commonwealth of Va., No. 3:09CV121-HEH, 2010 WL 331758, at *4 (E.D. Va. Jan. 26, 2010) (quoting House, 547 U.S. at 537).

## A.    Summary of the Evidence Presented at Trial

As summarized below, the evidence against Lugaro that was introduced at trial was overwhelming, and substantial and compelling evidence existed to support his conviction.

The four individuals at the residence, Steven Skeems, Joe Powell, Ryan Thomas, and Donald Soutiere, testified that on November 16, 2012, Shannon Brown and at least one other woman,[4]

---

[4] The two women who entered the residence before Lugaro and Christopher Averette were identified as Shannon Brown and Destiny White. (See, e.g., Mar. 19, 2014 Tr. 41.) In addition to identifying Shannon Brown and Destiny White, two of the four individuals at the residence testified that a third, unidentified woman was also present. (See, e.g., id. at 41, 62.) In Lugaro's instant § 2254 Petition, without providing any additional

had arrived at their residence uninvited. (See, e.g., Mar. 19, 2014 Tr. 15, 17, 41-42, 52-53, 62.) "A week prior to [the] incident on November 16th, there was a fight between one of the residents, his girlfriend, and the two women." (Mar. 19, 2014 Tr. 16.) The resident involved in the earlier fight, Paul Benner, was not present at the house on the night of November 16, 2012. (Mar. 19, 2014 Tr. 16.)

Shortly after the women entered the residence, Lugaro and Averette, both of whom were unknown to the four individuals at the residence, entered and were identified by the women as their boyfriends. (See, e.g., Mar. 19, 2014 Tr. 17-18, 29, 42-43, 49, 53, 62-64.) Mr. Soutiere testified that he observed Lugaro and Averette in the kitchen "talking to each other kind of low," and that the two men then asked if Mr. Soutiere was Paul Benner or if Mr. Soutiere knew where Paul Benner was at that time. (Mar. 19, 2014 Tr. 64.) Mr. Soutiere stated: "at first they were trying to just, you know, ask me like if I was him and I was lying to them. . . . And [then Averette] . . . was like, I'm not [expletive] playing. . . ." (Mar. 19, 2014 Tr. 65.)

Thereafter, Averette threatened Mr. Soutiere with a gun and told Mr. Soutiere to "get on the ground." (Mar. 19, 2014 Tr. 64-

---

information about how he learned the third woman's name, Lugaro now identifies the third woman as "Laura." (Mem. Supp. § 2254 Pet. 9, 11.)

65.) Lugaro stayed in the kitchen with Mr. Soutiere, and Averette told Lugaro to "watch [Mr. Soutiere]." (Mar. 19, 2014 Tr. 65.) Lugaro then told "[Mr. Soutiere] to stay on the ground" and to "[j]ust listen to what he says." (Mar. 19, 2014 Tr. 65.) At some point thereafter, Averette hit Mr. Powell and Mr. Skeems "in the back of [their] head[s] with the pistol," and took their wallets, cash, and cell phones. (Mar. 19, 2014 Tr. 23, 46.)

Subsequently, Averette went back to the kitchen, and asked Lugaro to get rope to tie up the victims, saying "We're going to shoot them." (Mar. 19, 2014 Tr. 23.) Lugaro then "made a loop around the back half of the house where [the] washing machine is and just kind of went - ran back there and then came back, said he couldn't find anything." (Mar. 19, 2014 Tr. 23.) When Averette was in the kitchen discussing looking for rope with Lugaro, Mr. Powell and Mr. Thomas "ran out of the back door into the backyard." (Mar. 19, 2014 Tr. 57.) Subsequently, Mr. Skeems "ripped the bannister rail off . . . and then hit [Averette] with it." (Mar. 19, 2014 Tr. 24.) Mr. Skeems hit Averette several times, and then Lugaro "approached [Mr. Skeems], put his hands around [Mr. Skeems's throat], [and] told [Mr. Skeems] to calm down." (Mar. 19, 2014 Tr. 24.) Mr. Skeems "had the remaining half of the railing and then hit [Lugaro] in the head with it for him to release his hands off of [Mr. Skeems's] throat," and "at that point[,] [Lugaro] let go and then just ran out the front door." (Mar. 19, 2014 Tr. 24.)

28

In addition to the four individuals who were at the house, Shannon Brown also testified at Lugaro's trial. (See Mar. 19, 2014 Tr. 69.) Brown testified that on November 16, 2012, she, Lugaro, Destiny White, and Averette were "hanging out," and that herself, White, and Averette were drinking alcohol and smoking marijuana. (Mar. 19, 2014 Tr. 70-71.) Brown indicated that she was "not sure" if Lugaro had consumed alcohol and marijuana. (Mar. 19, 2014 Tr. 70-71.) Brown testified that they had gone to "one of [Lugaro's] friend's house[s] to give a tattoo," and that "[Lugaro] was giving tattoos and [they] all hung out over there for a little while." (Mar. 19, 2014 Tr. 71.) Thereafter, they "drove around" and "just found mischief to get into." (Mar. 19, 2014 Tr. 71.)

At some point, "[they] were passing by Joel [Powell's] and D.J. [Soutiere]'s neighborhood," and Lugaro and Averette "wanted to go over there to kind of like scare them because . . . one of the boys had pushed [White] down and broken her finger." (Mar. 19, 2014 Tr. 71-72.) When they arrived at the Mr. Powell's and Mr. Soutiere's house, Brown and White "went to the house first by [themselves]." (Mar. 19, 2014 Tr. 72.) Thereafter, "[White] sent a text message from her phone saying how many people were in the house," "[s]o they would know how many people were [there]." (Mar. 19, 2014 Tr. 73.)

Approximately "two to five minutes" after White sent the text message regarding the number of people in the house, Lugaro and Averette entered the house. (Mar. 19, 2014 Tr. 73.) Brown testified that Lugaro and Averette "started talking about the incident the week before with the fight and they asked how it happened. The boys started laughing. [Averette] and [Lugaro] didn't find it amusing and that's when everything took place. They started getting violent. They took the gun out." (Mar. 19, 2014 Tr. 74.) At that point, Brown and White left the residence and "went and sat in the car." (Mar. 19, 2014 Tr. 74.)

Brown and White "were getting ready to leave them," and then Lugaro and Averette ran out of the house, "hopped in the car," and "[White] drove and got out of there." (Mar. 19, 2014 Tr. 74.) Brown testified that as they drove, Lugaro and Averette "were wiping off cell phones and throwing them out of the window and the wallets that they had taken and throwing them out the window." (Mar. 19, 2014 Tr. 74-75.) Brown, White, Lugaro, and Averette "[t]hen went to Portsmouth and [Lugaro and Averette] bought drugs with the money they stole." (Mar. 19, 2014 Tr. 75.)

With respect to the gun used during the robbery, Brown testified that the gun belonged to Lugaro, and "when [Lugaro] joined [Brown's] and [White's] and [Averette's] little group, he brought the gun with him." (Mar. 19, 2014 Tr. 76.) Brown also testified that once they arrived back at Averette's house, "[t]hey

scared [Brown and White] into turning [themselves] in . . . . They ended up -- because the police officers only knew [Brown's] and [White's] name[s], it was all going to get blamed on [Brown and White], so [Brown and White] turned [themselves] in." (Mar. 19, 2014 Tr. 76.) Brown stated: "[Lugaro] and [Averette] didn't want their names mentioned. They thought that if we said some random people's names that the attention would be off of them and they would have nothing against us." (Mar. 19, 2014 Tr. 77.) Brown and White told the police "[t]hat it was random people at a bar, at Rainbow Cactus, and fake names. And that it was them in a separate car and they drove off and [Brown and White] had no idea who the two random guys were." (Mar. 19, 2014 Tr. 77.)

On cross-examination, Brown admitted that she "[was] originally charged with felonies" and was facing "around 900 years" in prison, and that as a result of a plea agreement, the charges were "reduced to misdemeanors." (Mar. 19, 2014 Tr. 78.) Brown also admitted that her testimony at Lugaro's trial was inconsistent with her initial statements to the police, and that her statements regarding the incident had changed after she accepted the plea agreement. (Mar. 19, 2014 Tr. 79-80.)

**B. Lugaro's New Evidence of Innocence**

**1. Lugaro's Affidavit**

As support for his actual innocence claim, Lugaro submits his own affidavit. In Lugaro's affidavit, he states:

My name is Jesse Lugaro and I am the affiant who offers this statement as a true and accurate recollection of the circumstances involved in my case, which gives rise to the claims presented in my state and federal habeas corpus petitions.

On the day at issue, 11-16-2012, myself, Chris Averette, Shannon Brown, Destiny White, and a 3rd female named Laura were hanging out. The discussion turned to an incident that occurred earlier involving Brown and White, and resulted in White being injured by Paul Brenner [sic]. It was suggested that we go there so the girls could apologize to the other housemates at that residence and at no time did me or anyone discuss or plan to commit a robbery.

After the (3) girls entered the residence and apologized, it was okay to go in and party. I had no idea that Averette was in an agitated state and when he started asking where Paul Brenner [sic] was I became scared. When Averette pulled out a gun and started threatening everyone, including me, I feared he would shoot us. Averette started hitting people and taking things from their person and all I did was stand in the kitchen in a shocked state.

I never threatened or took anything from anyone. Averette told me to get some rope, but I never moved or attempted to assist him. I didn't want to get hurt, nor did I want to see anyone else get hurt and all I did was tell Mr. Soutiere to just do what he says. Averette was acting crazy and he has been known to be violent and commit violent acts.

At trial, I was shocked that my attorney didn't subpoena Ms. White, Ms. Esposito, or Laura, and I was equally disturbed that Ms. Brown's testimony had now changed. She lied and stated that I gave Averette the gun and that it was only her and Ms. White who were present. Ms. Brown's statement clearly identifies another female and never . . . mentions that I gave the gun to Averette. Ms. Brown also lied and testified that it was me and my mother, April Esposito, who fabricated her original version of events. I had no idea that Ms. Brown would be permitted to invent these inculpatory assertions at trial and I would have insisted that my attorney subpoena witnesses to impeach her perjurious averments.

I did not know Averette was intending to commit a robbery. I don't think he planned it either, but decided to rob those people after he became irate. I never had

a gun, nor did I give Averette a gun.  I didn't assist
Mr. Averette in any manner while he was committing this
crime, all I did was stand in the kitchen.  I should
have stopped him but I was just as scared as the victims
and he threatened to kill us if we turned him in.

(ECF No. 14-4, at 1-3 (ellipses in original.)

## 2.  April Esposito's Affidavit

Lugaro also submits an affidavit from April Esposito, his

mother.  (ECF No. 14-3, at 1-2.)  In Ms. Esposito's affidavit, she

states:

> My name is April Esposito and I'm the affiant in
> this statement who provides this true and accurate
> statement of certain circumstances directly relevant to
> Jesse Lugaro's habeas petition.  Jesse is my son yet
> this has no bearing on the veracity of my testimony.  I
> offer these averments under penalty of perjury.  I was
> in constant contact with Mr. Farashini and repeatedly
> expressed Jesse's desire to be tried by a jury, as did
> Jesse in writing, but Mr. Farashini stated that he knew
> the judge and everything was taken care of and would be
> all right.  I had direct knowledge and evidence
> pertaining to certain issues and I advised him I wanted
> to testify about Shannon Brown's false statements
> concerning my alleged participation in assisting her
> with a fabricated story.  I never advise[d] her or helped
> her in any way with creating a false story, just the
> opposite.  I convinced her to turn herself in along with
> Destiny White and to tell the truth and I even drove
> them to the police station.  I told Mr. Farashini this
> and that I had a picture of Mr. Averette in possession
> of another gun, other than the one in question, which I
> gave Mr. Farashini and this evidence was never
> presented.  I also told of Mr. Averette's threats of
> violence towards Shannon, Destiny, Laura, and Jesse if
> they identified him.  I was present on the day of the
> trial and ready to testify but Mr. Farashini refused to
> call me.  Shannon Brown and I had a discussion about my
> son's innocence and she stated that she was sorry but
> but [sic] this was the only way for her to avoid prison
> was to testify in the manner required to assist the
> prosecutor in obtaining a conviction since Jesse refused

to accept a guilty plea. She lied on the stand about several critical issues that she created to make Jesse look more involved than he actually was. It's a shame that she received probation for her involvement of conspiracy and the person responsible, Mr. Averette, received far less time than Jesse, all due to Jesse's refusal to plead guilty for something he didn't do, and the perjurious testimony that my son's attorney never impeached with the other witness, like Shannon Brown. Other witnesses like Destiny White and the girl, Laura, were never called to testify as they were never asked by [the] prosecution to testify as it would have conflicted with Shannon Brown's last testimony. Please give Jesse the justice that the law and evidence warrants and reverse his unlawful conviction.

(Id.)

### 3. Averette's Affidavit

After filing the instant § 2254 Petition, Lugaro filed a Motion for Leave to File Supplemental Pleading. (ECF No. 16.) In his motion, Lugaro requests that the Court allow him to file "an affidavit [from] Mr. Averette" as a "supplemental pleading." (Id. at 1-2.) Lugaro attached Averette's affidavit to his motion. (ECF No. 16-1.)

Lugaro's Motion for Leave to File Supplemental Pleading (ECF No. 16) will be granted in part and denied in part. To the extent that Lugaro seeks leave of Court to file Averette's affidavit, the motion will be granted. To the extent that Lugaro seeks leave of Court to file any additional supplemental pleading, the motion will be denied.

Because the Court will grant Lugaro's request to supplement his pleadings, the Court considers Averette's affidavit in its

34

analysis of Lugaro's § 2254 Petition.  In Averette's affidavit, which is dated May 29, 2019, he states:

> My name is Christopher A. Averette #1476730.  I'm guilty of the crimes that occurred on 11-16-12.  Jesse Lugaro is not guilty of my crimes.  He did not know I had a gun and was gonna [sic] to assault and rob the people of that residence.  I'm now serving my 14 year sentence for those crimes.

(ECF No. 16-1, at 1.)

### C.  Reliability of Lugaro's Evidence

The Supreme Court has explained that to be credible, three types of "new reliable evidence" may support a petitioner's allegations of innocence.  Schlup, 513 U.S. at 324.  These include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Id.  Lugaro's actual innocence claim is not accompanied by "exculpatory scientific evidence" or "critical physical evidence" not presented at trial.  Id.  Further, for the reasons set forth below, the affidavits submitted by Lugaro do not constitute "new reliable evidence."  Id.

As an initial matter, although Lugaro's affidavit and Averette's affidavit are notarized, the affidavits are not sworn to under penalty of perjury and the notaries did not administer an oath.  (ECF No. 14-3, at 3; ECF No. 16-1, at 1.)  Instead, Lugaro states:  "I am the affiant who offers this statement as a true and accurate recollection of the circumstances involved in my

case . . . ." (ECF No. 14-3, at 1.) Such a statement fails to transform the contents of the affidavit into sworn testimony. Price v. Rochford, 947 F.2d 829, 832 (7th Cir. 1991) (refusing to consider documents verified in such a manner to avoid the penalty of perjury); Hogge v. Stephens, No. 3:09CV582, 2011 WL 2161100, at *2-3 & n.5 (E.D. Va. June 1, 2011) (quoting Walker v. Tyler Cty. Comm'n, 11 F. App'x 270, 274 (4th Cir. 2001)) (treating statements sworn to under penalty of perjury, but made upon information and belief, as "mere pleading allegations"). Averette's affidavit does not include any statement regarding the veracity of the information set forth in the affidavit. (ECF No. 16-1, at 1.)

Furthermore, with respect to Lugaro's affidavit, the affidavit does not qualify as the sort of new reliable evidence described by the Supreme Court. See Schlup, 513 U.S. at 324; Perry v. Virginia, No. 3:13CV327-HEH, 2013 WL 4590619, at *4 (E.D. Va. Aug. 28, 2013) (concluding that defendant's post-conviction declaration of innocence could not support a claim of actual innocence); McGivery v. Johnson, No. 3:10CV455-HEH, 2011 WL 1838874, at *5 (E.D. Va. May 13, 2011). To accept such commonplace self-serving statements and declarations of innocence would ignore the Supreme Court's admonition that the quality of evidence necessary to support a claim of actual innocence "is obviously unavailable in the vast majority of cases." Schlup, 513 U.S.

36

at 324; see Calderon, 523 U.S. at 559 (emphasizing that new reliable evidence of innocence is a "rarity"). Moreover, rather than demonstrate Lugaro's innocence, in the affidavit, Lugaro admits that he was present during the robbery on November 16, 2012, and that he "[told] Mr. Soutiere to just do what [Averette] says." (ECF No. 14-3, at 2.)

As to the affidavit of Ms. Esposito, Lugaro's mother, although the affidavit is notarized and sworn to under the penalty of perjury, the contents of the affidavit do not constitute "new reliable evidence" of Lugaro's innocence. See Schlup, 513 U.S. at 324. Specifically, in the affidavit, Ms. Esposito details her disagreements with the decisions of Lugaro's trial counsel, as well as her disagreements with the prosecution's case against her son. (ECF No. 14-4, at 1.) Such statements have no bearing on Lugaro's actual innocence claim.

With respect to Averette's affidavit, as noted above, the affidavit does not constitute sworn testimony because it is not sworn to under the penalty of perjury and it contains no statements regarding the veracity of the affidavit. See Price, 947 F.2d at 832; Hogge, 2011 WL 2161100, at *2-3 & n.5. Further, it is unclear why Averette waited more than four years after Lugaro's trial to make any attempt to exonerate Lugaro. See McQuiggin, 569 U.S. at 399 ("Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the

requisite showing [of innocence].").  Additionally, although the affidavit is signed by Averette, it is unclear how Lugaro obtained this affidavit.  Lugaro states that he had requested that "[his] retained attorney . . . contact Mr. Averette and determine if he was willing to provide an affidavit," and that "Mr. Averette did prepare an affidavit, which was signed on 5-29-19."  (ECF No. 16, at 2.)  The Court notes that no attorney has entered an appearance on Lugaro's behalf in this action, and Lugaro fails to provide any additional explanation as to how he obtained the affidavit from Averette, a Virginia inmate incarcerated at a different prison facility than Lugaro.  Moreover, although Averette states that "[he is] guilty of the crimes that occurred on 11-16-12," and that Lugaro "did not know [Averette] had a gun and was gonna [sic] to assault and rob the people of that residence," Averette fails to provide any explanation about Lugaro's actions on the night in question.

Due to the circumstances surrounding the creation of the affidavit, including Lugaro's failure to provide any explanation regarding how he obtained the affidavit and Averette's omission of key information in the affidavit, such as failing to explain why he waited more than four years after Lugaro's trial to author the affidavit or to provide any explanation about Lugaro's specific actions on November 16, 2012, the affidavit is not trustworthy and is not indicative of reliability.  Specifically, these

circumstances do not demonstrate that Averette's affidavit is "trustworthy" such that the affidavit constitutes "new reliable evidence." Schulp, 513 U.S. at 324; see Calderon, 523 U.S. at 559 (emphasizing that new reliable evidence is a "rarity"); cf. United States v. Lighty, 616 F.3d 321, 375 (4th Cir. 2010) ("Post-trial recantations of testimony are 'looked upon with the utmost suspicion.'" (quoting United States v. Johnson, 487 F.2d 1278, 1279 (4th Cir. 1973))); Carter, 2010 WL 331758, at *4-6 (citations omitted) (finding that the timing and circumstances surrounding the creation of an accomplice's affidavit asserting the petitioner's innocence were relevant in determining the trustworthiness and reliability of the affidavit).

Thus, in light of the unreliable provenance of Averette's affidavit, and the deficiencies of both Lugaro's affidavit and his mother's affidavit, which are detailed above, Lugaro has not met his burden of producing new reliable evidence of his innocence. See Calderon, 523 U.S. at 559 (emphasizing that new, reliable evidence of innocence is a "rarity"). Thus, the Court need not proceed to the second part of the inquiry for Lugaro's gateway actual innocence claim. See Hill, 2010 WL 5476755, at *5 (citing Weeks, 119 F.3d at 1352-53; Feaster, 56 F. Supp. 2d at 610). Moreover, based on the evidence presented at trial, which is summarized above, overwhelming evidence exists of Lugaro's guilt, and given the totality of the evidence, see supra Parts IV, V.A,

Lugaro fails to demonstrate that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Sharpe, 593 F.3d at 377 (internal quotation marks omitted) (quoting Schlup, 513 U.S. at 327). Accordingly, Lugaro's actual innocence claim will be dismissed.

## VI. OUTSTANDING MOTIONS

### A. Motion for Evidentiary Hearing

After filing his § 2254 Petition, Lugaro filed a Motion for Evidentiary Hearing. (ECF No. 13.) In determining whether a case warrants an evidentiary hearing, a federal court must consider whether the evidentiary hearing would provide the petitioner the opportunity to "prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 475 (2007); see Mayes v. Gibson, 210 F.3d 1284, 1287 (10th Cir. 2000). A federal court must also consider the standards set forth in 28 U.S.C. § 2254 when considering whether an evidentiary hearing is appropriate. Schriro, 550 U.S. at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id.

Here, based on a thorough evaluation of Lugaro's claims and the record before the Court, the Court concludes that Lugaro's

40

claims lack merit. Therefore, the Court concludes that habeas relief under § 2254 is not warranted. Lugaro's Motion for Evidentiary Hearing (ECF No. 13) will be denied.

**B.   Motion to Stay Proceedings**

Lugaro also filed a Motion to Stay Proceedings. (ECF No. 15.) In his motion, Lugaro requests that the Court "stay the issuance of any judgments in [his] case so that [he] can be afforded an opportunity to amend or supplement [his] action under F.R.C.P. 15(a) and (d)." (Id. at 1.)   In support of his request, Lugaro states that "[he] has retained private counsel[5] who is in the process of acquiring exculpatory evidence from the actual perpetrator of these crimes, Chris Averette, who has agreed to submit an affidavit and testify at an evidentiary hearing." (Id. at 2.)

After Lugaro filed this motion requesting that the Court "stay the issuance of any judgments" to allow Lugaro to obtain "exculpatory evidence from the actual perpetrator of these crimes, Chris Averette," Lugaro requested leave of Court to supplement his pleadings and he submitted Averette's affidavit. (Id. at 1-2; see ECF No. 16; ECF No. 16-1.)   As discussed above, the Court grants Lugaro's request to supplement his pleadings to the extent that he seeks leave of Court to file Averette's affidavit.

---

⁵ As discussed above, Lugaro is proceeding pro se, and no attorney has entered an appearance on his behalf in this action.

Accordingly, Lugaro's Motion to Stay Proceedings to allow him "to amend or supplement [his] action" (ECF No. 15) is denied as moot because Lugaro has subsequently filed his supplemental pleading.

## VII. CONCLUSION

For the foregoing reasons, Respondent's Motion to Dismiss (ECF No. 9) will be granted. Lugaro's § 2254 Petition (ECF No. 1) will be denied and his claims will be dismissed. Lugaro's Motion for Leave to File Supplemental Pleading (ECF No. 16) will be granted in part and denied in part. Lugaro's Motion for Evidentiary Hearing (ECF No. 13) will be denied. Lugaro's Motion to Stay Proceedings (ECF No. 15) will be denied as moot. The action will be dismissed. A certificate of appealabilty will be denied.

The Clerk is directed to send a copy of Memorandum Opinion to Lugaro and counsel of record.

It is so ordered.

/s/ _REP_

Robert E. Payne
Senior United States District Judge

Date: _September 3, 2019_
Richmond, Virginia